# 20-2479-cr(L),
## 20-2714-cr(CON), 20-2722-cr(CON), 20-2980-cr(CON)

# United States Court of Appeals
### *for the*
## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

DOMINIC TRUSCELLO, JOHN CASTELUCCI, AKA Big John, TINDARO
CORSO, AKA Tino, JOSEPH VENICE, JAMES MAFFUCCI, AKA Jimmy the
Jew, JOSEPH DATELLO, AKA Big Joe, AKA Joey Glasses, PAUL CASSANO,
AKA Paulie Roast Beef, VINCENT BRUNO, BRIAN VAUGHAN, CARMINE
GARCIA, AKA Spanish Carmine, RICHARD O'CONNOR, ROBERT CAMILI,
JOHN INCATASCIATO, STEVEN CREA, JR.,

*Defendants,*

CHRISTOPHER LONDONIO, TERRANCE CALDWELL, MATTHEW
MADONNA, STEVEN CREA, SR., AKA Wonder Boy,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT SUPPLEMENTAL BRIEF
## FOR DEFENDANTS-APPELLANTS

ANDREW PATEL, ESQ.
15 Chester Avenue
White Plains, New York 10601
(212) 349-0230

JOSHUA L. DRATEL
LAW OFFICES OF DRATEL & LEWIS
29 Broadway, Suite 1412
New York, New York 10006
(212) 732-0707

*Attorneys for Defendant-Appellant Matthew Madonna*

*(For Continuation of Appearances See Inside Cover)*

ANTHONY DiPIETRO, ESQ.
15 Chester Avenue
White Plains, New York 10601
(914) 948-3242

    – and –

BRENDAN M. WHITE, ESQ.
524 East 20th Street, #6-D
New York, New York 10009
(646) 303-0267

*Attorneys for Defendant-Appellant*
   *Steven Crea, Sr.*

CLARA KALHOUS, ESQ.
116 Pinehurst Avenue, #H13
New York, New York 10033
(347) 415-9523

*Attorney for Defendant-Appellant*
   *Christopher Londonio*

BRIAN A. JACOBS
DANIEL P. GORDON
MORVILLO ABRAMOWITZ GRAND
   IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
(212) 856-9600

*Attorneys for Defendant-Appellant*
   *Terrance Caldwell*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................v

Introduction ...........................................................................1

Statement of the Facts ............................................................3

    A.    The Post-Trial Disclosures ...................................................3

        1.    Post-Trial Disclosures Related to Government Witness David Evangelista ......................................................3

            a.    The Government's October 26, 2020, Letter Regarding Recordings of Evangelista's Telephone Calls from MDC .............................................3

            b.    Evangelista's Access to Information About the Murder of Meldish ............................................4

            c.    Evangelista's Clear Intention to Leverage His Cooperation for Improper Personal Advantage and Retaliation Against Others.......................................5

            d.    Evangelista's Motives for Bias Against the Defendants ...................................................6

            e.    Evangelista's Exposure to Perjury Charges ....................6

            f.    Evangelista's Efforts to Avoid the Consequence of His Guilty Plea Contemporaneous With His Claimed Receipt of Londonio's Confession to Murder .................................................................7

            g.    Evangelista's Continued Drug Use While Cooperating.....................................................8

            h.    Evangelista's Ongoing Mental Health Issues.................9

            i.    Evangelista's Continued Criminal Conduct While Attempting to Cooperate with the Government in the Summer of 2017 ...............................9

        2.    Post-Trial Disclosures Related to Government Witness John Pennisi ...........................................................10

i

a. Murder and Violence Did Not Require Leadership Approval ......................................................11

b. LCN Members Are Not Necessarily "In the Know" .................................................................13

c. Pennisi's Pervasive Bias Against the Luchese Family ...........................................................14

d. Pennisi's Unstable Mental State .....................................16

e. Pennisi's Undisclosed Violent Conduct and Criminal History ...........................................................17

f. Pennisi's Flight After Committing a Homicide ............19

g. Pennisi's Account of the Meldish Homicide .................19

B. The District Court's Decision Denying the Motion ............................21

ARGUMENT .........................................................................................23

POINT I

A NEW TRIAL SHOULD BE GRANTED FOR ALL FOUR DEFENDANTS BECAUSE NEWLY DISCOVERED EVIDENCE AND/OR UNDISCLOSED *BRADY* AND/OR 3500 MATERIAL WOULD HAVE RESULTED IN EITHER AN ACQUITTAL OR A DIFFERENT RESULT AT TRIAL .........................................................23

A. Legal Standards Pertinent to a Rule 33 Motion Based on Newly Discovered Evidence .................................23

B. Legal Standards Applicable to Undisclosed *Brady* Material ...............................................................24

C. The Legal Standards Applicable to Non-Production of 3500 Material ...................................................26

D. The Standard for False Testimony By a Government Witness .................................................................28

E. The Cumulative Effect of Non-Disclosure Can Be Material ...............................................................29

F.    The Newly Discovered and/or Untimely Disclosed Information Was Material Because It Undermined Central Elements of the Government's Theory, Provided Important New Impeachment of Key Government Witnesses, and Established That Those Witnesses Committed Perjury at Trial ..................................... 29

    1.    The Newly Discovered and/or Untimely Disclosed Information Undermines Essential Elements of the Government's Theory of Liability .......................................................................... 30

        a.    The New Information Repudiates the Government's Theory That Any Murder Required Permission from Leadership ................ 30

        b.    That the Murder Was Committed on Behalf of the Luchese Family ............................ 35

            i.    Pennisi's Account of the Reasons for the Meldish Homicide Varies Dramatically from the Government's ............................................. 36

            ii.    Pennisi's Podcast Statements Demonstrate That an LCN Member Would Not Be "In the Know" Regarding Murders ................................... 37

G.    The New Information Would Have Impeached the Credibility of Critical Government Witnesses Regarding Substantive Aspects of the Case and the Witnesses' Bias Against Appellants ......................................... 38

    1.    The New Information Provided Material Additional Avenues of Impeachment ........................... 42

        a.    The New Avenues of Impeachment of Evangelista ......................................... 42

        b.    The New Avenues of Impeachment of Pennisi ................................................. 45

2.    The New Information Is Not Cumulative .......................51

H.    The New Information Establishes That Pennisi and Evangelista Committed Perjury During Their Trial Testimony ..............................................................................52

POINT II

THE DISTRICT COURT ERRED IN CONCLUDING MDC WAS NOT PART OF THE PROSECUTION TEAM .............................................53

POINT III

THE GOVERNMENT CONSTRUCTIVELY POSSESSED THE EVANGELISTA RECORDINGS ..................................................57

POINT IV

AN EVIDENTIARY HEARING IS REQUIRED TO DETERMINE THE SCOPE OF THE UNTIMELY DISCLOSED INFORMATION AND/OR THE SCOPE OF THE GOVERNMENT'S MISCONDUCT .......58

Conclusion ...............................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Agurs v. United States*,
427 U.S. 97 (1976)..........................................................28

*Banks v. Dretke*,
540 U.S. 668 (2004)....................................................28, 41

*Brady v. United States*,
373 U.S. 83 (1963)..................................................*passim*

*Chandris v. McGinnis*,
2002 WL 31946711 (E.D.N.Y.) ....................................56

*Cone v. Bell*,
556 U.S. 449 (2009)....................................................24, 29

*Conley, v. United States*,
415 F.3d 183 (1st Cir. 2005)..........................................51

*Giglio v. United States*,
405 U.S. 150 (1972)........................................26, 41, 56, 57

*Kansas v. Ventris*,
556 U.S. 586 (2009)........................................................44

*Kulhawik v. Holder*,
571 F.3d 296 (2d Cir. 2009) ..........................................59

*Kyles v. Whitley*,
514 U.S. 419 (1995)....................................................25, 55, 56

*Mastracchio v. Vose*,
274 F.3d 590 (1st Cir. 2001)..........................................56

*Peavy v. United States*,
31 F.3d 1341 (6th Cir. 1994) ..........................................58

*Pennsylvania v. Ritchie*,
480 U.S. 39 (1987)..........................................................25

*Smith v. New Mexico Department of Corrections*,
    50 F.3d 801 (10th Cir. 1995) ........................................................51

*Strickler v. Greene*,
    527 U.S. 263 (1999)...........................................................26, 40

*Su v. Filion*,
    335 F.3d 119 (2d Cir. 2003) ..........................................28, 40, 41

*Turner v. United States*,
    137 U.S. 1885 (2017) ..................................................................41

*United States v. Autori*,
    212 F.3d 105 (2d Cir. 2000) .......................................................24

*United States v. Bagley*,
    473 U.S. 667 (1985).....................................................................26

*United States v. bin Laden*,
    397 F. Supp. 2d 465 (S.D.N.Y. 2005) ......................27, 56, 58, 59

*United States v. Boyd*,
    55 F.3d 239 (7th Cir. 1995) ........................................................52

*United States v. Burnside*,
    824 F. Supp. 1215 (N.D. Ill. 1993)......................................41, 51

*United States v. Certified Environmental Services, Inc.*,
    753 F.3d 72 (2d Cir. 2014) ..............................................24, 25, 26

*United States v. Dubose*,
    619 F.2d 973 (2d Cir. 1980) .......................................................28

*United States v. Evangelista*,
    17 Cr. 191 (RA) ..........................................................................41

*United States v. Forbes*,
    790 F.3d 403 (2d Cir. 2015) .......................................................23

*United States v. Hilton*,
    521 F.2d 164 (2d Cir. 1975) .......................................................27

*United States v. Jackson*,
    345 F.3d 59 (2d Cir. 2003) .........................................................25

*United States v. Kahn*,
    472 F.2d 272 (2d Cir. 1973) ..................................................25, 27

*United States v. Mahaffy*,
    693 F.3d 113 (2d Cir. 2012) ..................................................26, 28

*United States v. Middendorf*,
    2018 WL 3956494 (S.D.N.Y. 2018) ........................................54

*United States v. Morell*,
    524 F.2d 550 (2d Cir. 1975) ..................................................27, 56

*United States v. Owen*,
    500 F.3d 83 (2d Cir. 2007) ....................................................23

*United States v. Owens*,
    933 F. Supp. 76 (D. Mass. 1996).............................................56

*United States v. Rivera*,
    2015 WL 1540517 (E.D.N.Y. Apr. 7, 2015) .............................55

*United States v. Seijo*,
    514 F.2d 1357 (2d Cir. 1975) ................................................28

*United States v. Siddiqui*,
    959 F.2d 1167 (2d Cir. 1992) ................................................24, 58

*United States v. Stewart*,
    433 F.3d 273 (2d Cir. 2006) ..................................................55

*United States v. Stofsky,*
    527 F.2d 237 (2d Cir. 1975) ..................................................28

*United States v. Thomas*,
    19 Cr. 830 (AT) ...................................................................55

*United States v. Turner*,
    490 F. Supp. 583 (E.D. Mi. 1979) ..........................................27

*United States v. Wallach*,
    935 F.2d 445 (2d Cir. 1991) ..................................................28

*United States v. White*,
    366 F.3d 291 (4th Cir. 2004) .................................................58

*United States v. Wilson*,
    237 F.3d 827 (7th Cir. 2001) ..........................................................................56

*United States v. Wilson*,
    481 F.3d 475 (7th Cir. 2007) ........................................................................51

*United States v. Wong*,
    78 F.3d 73 (2d Cir. 1996) ..............................................................................26

*Zappulla v. New York*,
    391 F.3d 462 (2d Cir. 2004) ..........................................................................44

**Statutes & Other Authorities:**

18 U.S.C. § 3500 ..................................................................................*passim*

Fed. R. Crim. P. 29 ...........................................................................................24

Fed. R. Crim. P. 33 ..........................................................................................*passim*

Fed. R. Evid. 806 ...............................................................................................36

Luke G. Allen, *Lies Behind Bars: An Analysis of the Problematic Reliance
    on Jailhouse Informant Testimony in the Criminal Justice System
    and a Texas-Sized Attempt to Address the Issue*, 98 Wash. U. L.
    Rev. 257 (2020) ...........................................................................................44

**Introduction**

This Brief is submitted on behalf of defendants Matthew Madonna, Steven Crea, Sr., Christopher Londonio, and Terrance Caldwell[1] ("Appellants") in support of their appeal from the District Court's denial of their motion, pursuant to Rule 33, Fed.R.Crim.P., for a new trial based on newly discovered evidence and the government's failure to disclose exculpatory information and material pursuant to *Brady v. United States*, 373 U.S. 83 (1963) and its progeny, and/or produce witnesses' prior statements pursuant to 18 U.S.C. §3500 ("3500 material").

The newly discovered and/or untimely disclosed *Brady* and/or 3500 material (collectively, the "new evidence") undermined central elements of the government's theory of liability with respect to the charged homicide of Michael Meldish:

- that a murder required the knowledge and approval of Luchese Family leadership, including Madonna and Crea; and

- that the murder was committed by and on behalf of the Luchese Family.

The new evidence would have impeached the credibility of critical prosecution witnesses concerning substantive aspects of the case and exposed the witnesses' bias against the defendants. The new evidence was discovered after

---

[1] Defendant-Appellant Caldwell does not join in Point I(F)(1)(a).

1

trial only because of the government's untimely production of recorded telephone calls by cooperating witness David Evangelista while he was detained at the Metropolitan Detention Center ("MDC") in Brooklyn, and submissions filed in connection with his sentencing, or public statements made by its cooperating witness John Pennisi on multiple podcasts and other forums.

In denying the motion, the District Court abused its discretion in three respects:

(1)    concluding the new evidence was not material, it failed to recognize its critical character and potential impact on the trial;

(2)    concluding that the investigators and staff at MDC were not part of the prosecution team herein, it misapplied the applicable standard; and

(3)    refusing to conduct an evidentiary hearing, it engaged in speculation and otherwise improperly relied on incompetent and unsworn hearsay.

Accordingly, because the newly discovered evidence would have resulted in an acquittal, and/or because the timely production of either *Brady* or 3500 material would have produced a different result at trial, it is respectfully submitted that Defendants' Rule 33 motion should have been granted.

2

## Statement of the Facts

**A.**    ***The Post-Trial Disclosures***

This Statement of Facts describes the substance of the post-trial disclosures upon which the Rule 33 motion relied.  The underlying facts of the case are set forth in Appellants' individuals Briefs, and are incorporated by reference herein.

### 1.    *Post-Trial Disclosures Related to Government Witness David Evangelista*

The new evidence concerning government witness David Evangelista came from: (1) 33 of his recorded prison telephone calls; and (2) submissions in connection with his February 2020 sentencing.

### a.    *The Government's October 26, 2020, Letter Regarding Recordings of Evangelista's Telephone Calls from MDC*

Nearly a year after trial concluded, the government filed a letter October 26, 2020 (A-1702),[2] "to inform the Court and the defendants about a set of recorded phone calls made from [MDC] by cooperating witness David Evangelista that recently came into the Government's possession."  The government's letter "briefly outline[d] its understanding of how it came to possess these recordings…."  *Id.* According to the government's letter, in response to a subpoena it served on the MDC "roughly six weeks before trial,"

> [a]n MDC employee mistakenly gathered Evangelista's
> recorded calls for the time period covered by the

---

[2] "A" refers to the Appendix, and "S.A." to the Special Appendix, filed herewith.

> subpoena, and placed them on a compact disc (the
> "Disc").  The employee then put the Disc aside, to be
> picked up by the Government, as is the employee's usual
> practice.  The MDC did not notify the Government that
> the Disc had been created, and because the Government
> had not requested the Disc and was not aware of its
> existence, it made no effort to retrieve the Disc from the
> MDC.

*Id*.

Subsequently, "[o]n September 22, 2020, an investigator with [the U.S. Attorney's Office] office went to the MDC to retrieve recordings for another prosecutor in the Office.  At that time, an MDC employee also provided the investigator with several other sets of recordings, including the Disc…." *Id*. While the Disc included 70 of Evangelista's recorded prison calls, the Government has, as of this date, produced only 33 of them to Appellants.   *Id*.

> **b.**   ***Evangelista's Access to Information About the Murder of Meldish***

Evangelista's sentencing submission, along with his post-trial interview with *GangLand News*, demonstrated that he was aware of and had continuous access to "tabloid press" that covered the prosecution of the Appellants before he testified, including accounts that "feasted on the vivid details of Evangelista's egregious past and [his] anticipated testimony".  A-1961.

4

**c.**    ***Evangelista's Clear Intention to Leverage His Cooperation for Improper Personal Advantage and Retaliation Against Others***

The prison calls demonstrated that Evangelista viewed cooperation as a mechanism for improper personal advantage and retaliation against others in the form of his reporting to the Government about crimes (whether true or untrue) they had committed.  *See e.g.*, A-1966. The prison calls also established that Evangelista and his family were in a dispute about his attempts to cooperate, and that the government was in possession of such communications.  *See* A-1982, 1988.

For example, while speaking to his mother about his own brother, Evangelista threatened her:  " Take heed to my letters that I sent you, and take heed to what I'm saying.  If I receive any more mail, I don't care who died or whoever, if I receive any more mail, I'm going to open a can of shit on your son... Trust me. Trust me, this – your son – your son will be locked up if I get another letter.  I can guarantee you on that."  *Id.*;  A-1974-1975 ("believe me on this, then I will be dragging people through the mud, I can guarantee you on this, and everything ... I can guarantee you a can of worms is going to be opened up so bad, believe me"); A-1979-1980 (other party to the conversation advising Evangelista, "what's going on with threatening people?  …  Because I'm being told that you're threatening people and their children").

### d. *Evangelista's Motives for Bias Against the Defendants*

In connection with his sentencing, Evangelista claimed to have endured several years of abuse and pressure not to cooperate against Appellants, resulting in his placement in the specialized prison housing unit within the MDC. A-1961, 1996. Evangelista claimed he was "mocked, reviled and threatened – indirectly and directly" by Londonio and prison officials. A-1961. Evangelista claimed, "Correctional officers threatened him," "encouraged [him] to cease cooperation," called him a "rat," and "beat him and maced him in the eyes and mouth in retaliation." *Id.* The government's sentencing submission further revealed that it intervened at times to assist Evangelista, including to provide for him a more "comfortable experience" at the Orange County Jail before he testified. A-1996. *See* A-1996.

### e. *Evangelista's Exposure to Perjury Charges*

Despite vouching for Evangelista's veracity at trial, the prison calls reflect that Evangelista had committed fraud in connection with his own criminal case and that the government threatened to charge him with perjury by July 2017. *See* A-1969-1974, 1998. Regarding the Government's threat of a perjury charge, Evangelista had this exchange during a prison call:

> EVANGELISTA: Yeah, they're going to try to hit me with a new charge, again, these people.

OTHER PARTY: What you talkin' about?

EVANGELISTA: Well, I don't know, I guess mommy, somebody said something and everything. they said, well, you know – well, then…

OTHER PARTY: What kind of charge?

EVANGELISTA: I guess uh, perjury some shit like that.  So…

A-1999.

### f.  *Evangelista's Efforts to Avoid the Consequence of His Guilty Plea Contemporaneous With His Claimed Receipt of Londonio's Confession to Murder*

The prison recordings further revealed that Evangelista engaged in elaborate schemes to withdraw his guilty plea, which were contemporaneous with his attempt to cooperate against Londonio. On the night before he claimed to the government that Londonio had tried to escape and had confessed to the Meldish homicide, Evangelista told his sister that he had to "try to do something" in order to escape the consequence of his guilty plea:

> I'm telling you man, I'm going to take my plea back.  I want to try to take my plea back. I've got to. I've got to . . . and everything, cause this, cause this is getting crazy – yeah my sentencing day is September 15th, it's coming too close, I've got to try to do something, try to get in touch with the judge or something, because I need my plea back.  I want to take my plea back.  Nah, this is crazy.

A-2003-2004.

7

Evangelista further schemed to withdraw from his guilty plea by committing fraud on his sentencing judge, in that he would lie and tell the court that his lawyer tricked him into pleading guilty and made false promises about his sentencing exposure.  A-2012 ("I'm going to the judge.  You tricked me into taking this plea. You promised me 60 months with a cap if I turned myself in, this, that.  And I'm going to tell them.  I'm going to write a letter to the Judge, that's all").

### g.      *Evangelista's Continued Drug Use While Cooperating*

Notwithstanding the Government's divergent representations at trial that Evangelista had ceased using drugs by 2016, Evangelista continued to abuse drugs during both his cooperation and while he interacted with Londonio in the summer of 2017.  A-2024 (Prison Recording, dated June 14, 2017 ("I don't care, yeah, I got addiction, whatever, whatever.  Things take over my life . . .  Listen, I'm just telling you, though, I have an addiction.  I have a very bad addiction, do you hear me, a very bad addiction and everything, and people were trying to take steps to get this fixed and everything, . . .").

During the pendency of Appellants' motion, *GangLand News* published an interview of Evangelista admitted that he was not drug-free until a week before his trial testimony. A. 2352-2356, A-2353.

### h. *Evangelista's Ongoing Mental Health Issues*

While some of the sentencing submissions in Evangelista's case remain sealed, Evangelista's sentencing judge ordered that he participate in a "mental health treatment program." A-2044.

### i. *Evangelista's Continued Criminal Conduct While Attempting to Cooperate with the Government in the Summer of 2017*

The prison calls further demonstrate that Evangelista continued to engage in undisclosed criminal activity while attempting to cooperate in the summer of 2017, including his engagement in acts of extortion, wire fraud, and narcotic sales.

For example, in late July 2017, Evangelista attempted to extort MDC inmate Alexsandr Burman and his wife after Burman had failed to pay a $400 drug debt to Evangelista. *See, e.g.*, A-2051-2052; A-2056. In full predatory mode, Evangelista threatened Mrs. Burman that her husband could be harmed if Evangelista was not paid:

> I know he's your husband….and I understand he has a habit, he caught a habit in here, I understand that, and everything . . . I called you and everything, I know he's in Otisville right now, because I know people that are there, and everything. You know I don't want to send a message over there and let him know what you're doing is wrong because it's like a slap in my face…. I took care of my part. I did what I had to do and everything, you know and I appreciate – I appreciate everything that you did and everything, and I just want you to know it's got nothing to do with you, what he's doing – to me what he's doing to you is wrong, it's really wrong and

9

> everything. Because he's not thinking. He's only
> thinking about one thing, and one thing only and
> everything and it's not right . . . But, but this guy, you
> know he's telling lies, and he's got 10 years to do. It's
> not he's got a little time to do. It's not going to be good
> for him.

A-2051-2052.

Displaying his capacity for comprehensive fabrication, he engaged in

perverse deceit, attempting to gain Mrs. Burman's sympathy to convince her to pay

him by weaving the fiction that he was married and had a sick seven-year-old

daughter in need of medical care:

> I've got a daughter, she's seven years old, she's sick and
> everything and my wife needs to take her to the doctor
> and everything, that's why – and he knew about this and
> everything.

A-2053.

Evangelista also successfully deceived his own family member, who he

convinced to retrieve the hoped-for extortion payment from Western Union,

representing that he had done legal work in prison and was receiving payment

therefor. A-2007.

### 2. *Post-Trial Disclosures Related to Government Witness John Pennisi*

After trial, government witness John Pennisi appeared on at least 75

podcasts during which he discussed generally his criminal history, his association

with and membership in organized crime families, and matters directly relevant to his testimony.

Pennisi revealed information entirely at odds with his testimony and the government's theory of the case, including (1) whether, in the context of LCN (and the Luchese Family specifically), leadership approval was required for acts of violence; (2) whether being a member of an organized crime family was necessarily commensurate with "being in the know" with respect to its activities; (3) his prior criminal history, particularly with respect to acts of fraud, violence, and use of firearms; (4) his bias against Appellants (particularly Madonna and Crea) because he blamed the Luchese Family for threats and plots against his life; (5) his capacity for deception and prevarication; and (6) his mental instability.

The podcasts impugned not only Pennisi's testimony, but also that of the government's expert, United States Attorney's Office Special Agent John Carillo, with respect to the protocols and conventions of organized crime families. The podcasts also demonstrated that Pennisi hid from the government – or the government withheld evidence of – the full range and nature of his criminal past.

### a. *Murder and Violence Did Not Require Leadership Approval*

Pennisi revealed that an LCN "made member" does *not* need to seek permission from the "administration" to injure or kill an associate/civilian (i.e., Michael Meldish). *See* A-1710-13. Pennisi cited examples, including Pennisi's

own plan to violently attack John Gotti, Jr. and another man ("Big Steve").  A-1722, 1743. In describing his plan, Pennisi recounted that "what we were going to do was…ambush him and you know it wasn't going to go well for Steve, and it wasn't going to go well for John, Jr.  And we would have left the both of them there, right in the parking lot…."  A-1725-1726A-1726-34.

In another podcast, Pennisi was asked with respect to acts of violence, including murder, "who could make the call on their own, and push down that – that order?"  Pennisi answered:

> [i]t basically could come from the Administration down. I mean – and it could be with – you know, it could come from anybody in the Administration.  It could come from a Captain.  It could come from a friend himself.  I mean, we – you know we spoke about – we did an episode about John, Jr.
>
> \*                    \*                    \*
>
> That kind of came from us, me myself and you know that – it could come from a friend himself too.

A-1747. *See also* A-1744.[3]

Pennisi further revealed that the Luchese Family did not sanction the attempted murder of Enzo Stagno (charged in Count Four), but it instead was committed by Meldish without authorization.  A-1762, A-1763 ("So, now he

---

[3] *See also* A-1736 ("…And so, sometimes you don't go by protocol, you just act, you know and as a friend, you can do that").

12

definitely didn't get permission to do that, and if he did, no one is going to admit to it. So, it's just like he had no permission to do that. Mostly likely, he seeked revenge on his own").

Even Pennisi claimed he was once targeted for violence without approval. He revealed that another alleged member of the Luchese family, Joe Perna (who was mentioned often during trial), had attempted to murder Pennisi without permission from the Luchese administration. A-1711 (Perna "didn't get permission for that," but was "acting on his own").

According to Pennisi, permission is required only when the intended victim is a member of LCN, and, even in those instances, as he claimed with respect to Perna's plot against him, an attack could still be carried out by that member "on the sneak" (*i.e.*, without seeking permission) or without even needing to seek permission if the circumstances permitted (*i.e.*, the target was labeled a "rat"). *See* A-1709-1711; A-1747.). Without doubt, Pennisi conveyed that the murder of a non-member of LCN (i.e., Michael Meldish) required no approval whatsoever. *Id.*; A-1708-1710, A-1744; *see also* A-2149, A-2192-2193.

### b. *LCN Members Are Not Necessarily "In the Know"*

Contrary to the government's arguments regarding the reliability of Joseph Datello's hearsay (addressed in POINT I of Madonna's Brief), Pennisi also revealed that membership in the Luchese family did not amount to being "in the

know" regarding the enterprise's or its members' activities.  Serious matters such

as murders were not typically discussed by anyone.  Pennisi explained the dynamic

in the context of *this case*:

> People don't understand.  They think like everybody is in
> the know.  And you don't have to be that way.  You don't
> have to be in the know of what other crews are doing.

A-1764.

### c.  *Pennisi's Pervasive Bias Against the Luchese Family*

Pennisi acknowledged his deep bias against members of the Luchese Family.

He alleged the Luchese Family had on multiple occasions dispatched assassins to

kill him, but that he had fended them off with a firearm.  *See* A-1787, A-1788, A-

1809-1810.  Closely preceding the time of his cooperation, Pennisi's pistol became

his constant companion:

> [w]hen somebody was laying on my house, I didn't go to
> the FBI.  I put a pistol in my waistband and went after
> them and walked around with a pistol on me.  Went to
> meetings with a pistol on me.  Met with Captains, met
> with guys….

A-1815-1816.

Pennisi also accused the Luchese family of tasking members of the Bloods

gang to kill him at his job site, and that he successfully chased them away in the

middle of Manhattan.  Pennisi claimed that "they're sending Bloods.  I'm in a

pearly white neighborhood.  There's a guy with dreadlocks and a red – a red – I'm

saying, I can't even believe it."  A-1811.  "I'm chasing these guys," Pennisi continued. "At my job in Manhattan, down 7th Avenue, I'm chasing five, six Black guys, Bloods in the street that they sent." [4]

Pennisi further claimed that he retained his text messages with Luchese Family personnel (which were not produced to the defense), through which he communicated his withdrawal from the organization.  A-1788;  A-1792.  He also threatened members of the Luchese Family and explicitly warned them he would kill them if they approached him.  *See* A-1801-1804.

Pennisi never forgave the Luchese Family or its personnel, A-1835, and the government cultivated and exploited that resentment before Pennisi testified. Pennisi revealed that FBI agents and prosecutors encouraged his perception that the Luchese Family was trying to kill him:

> and we've all heard it we see comments, a lot of people say that oh, that must have been law enforcement that was sitting on you by your house.  And oh, what did you turn over law enforcement, you made a mistake.  And you got delusional.  Or you're paranoid, or what have you….  And you know no one ever wants to admit to that, but you know – it was just good to get his perspective, because of his former position with law enforcement.  And who better to give an answer than him [Gary Jenkins] and to be honest with you, the agents

---

[4] Pennisi recognized that, as a felon, there were serious potential legal consequences resulting from his possession of a firearm, yet he still chose to carry a pistol into New York City.  A-1834 ("[d]on't forget I was traveling to Penn Station with the thing every day in my knapsack, passing cops, undercover cops, in Penn Station. . .  All it takes is one search – one search of my bag, I'm done").

> themselves said the same thing. They said, you know we
> wouldn't of – we would have never let you; you know
> carry on like that. We would have stopped you. And we
> would have identified ourselves.

A-1858-1859. *See also* A-1865.

By stoking Pennisi's perception that the Luchese Family was seeking to kill

him, the government actively contributed to Pennisi's bias against Appellants,

particularly Madonna and Crea, who he alleged were in the organization's

hierarchy. T. 1354-56.

### d.    *Pennisi's Unstable Mental State*

The government's conduct compounded the fact that, given Pennisi's mental

health history, his fears of the Luchese Family's intentions could well have

constituted unwarranted paranoia. In describing the events influencing his decision

to cooperate, Pennisi cited the alleged attempts on his life as well as a supernatural

intervention by his deceased grandparents:

> I know we're not supposed to ask for a sign, and I'm
> praying to my grandparents, just give me a sign that what
> I'm – is the right thing, and then if I don't get a sign, I
> just do it on my own, and I just keep trying to you know
> run around with the pistol and make the best of it, right?
> I had dishes, you know glasses, I had a Baker's rack with
> wine glasses, and all kinds of extra you know dishes and
> everything, . . . I had to call my mother up and make her
> listen to it. It was like there was an earthquake. Not for
> 10 minutes, I'm talking about for hours, ding, ding, ding,
> ding, ding, ding, ding, all the dishes, all the glasses,
> everything was binging, like ding, ding, ding, ding, ding,

16

> . . . But I call my mother, I says you're not going to –
> listen to this.  She says, what is that?  I says, let me tell
> you – let me tell you what I did.  She says, oh my God, I
> hear it, like an earthquake right?

A-1871.  *See also* A-1870-1871 ("I had dishes and everything in the cabinets. You

know and there was no earthquake or nothing like that.  And the whole, all you

heard was ding, ding, ding, ding, ding, ding for hours Bobby.  . . .  And you know

that was my sign, you know").

Nor was Pennisi's mental instability an idle observation.  He admitted to

suffering from a chemical imbalance and that failed to take prescribed medication.

*See* A-1877.

### e. *Pennisi's Undisclosed Violent Conduct and Criminal History*

Pennisi confessed he had committed additional crimes, including repeatedly

discussing in detail his self-authorized plan to attack John Gotti, Jr. – another

incident not recorded in Pennisi's 3500 material. Pennisi recounted that while it did

not "come to fruition," he stalked his target "every day," first at a pizzeria, and

then at a Chinese restaurant.  Regarding the presence of "Big Steve" (who was not

regarded as dangerous), Pennisi characterized him (and any injuries he would

suffer, or even death) as "collateral damage."  A-1744.  *See also* A-1722, *passim*.

Pennisi further admitted that he was so paranoid about his life being in

danger that he illegally possessed and brandished a firearm beyond the instances

17

reflected in his cooperation agreement, including against innocent civilians. *See* A-1787 ("[a]nd there was an incident where, I think it was a UPS guy…went to go walk into the side by my house, and I had the lights that came on, except they were a little bit delayed.  And by the time the lights came on, I had a pistol out pointed at the guy….  I almost shot that guy."); *See* also A-1788, A-1809-1810; A-1815-1816.

Pennisi also disclosed that in 1989, while he was on pretrial release in connection with a homicide charge, he had carried a firearm and conspired with his co-defendant Michael Liguori to kill Vito Guzzo if their meeting with Guzzo did not go as hoped:

> [w]hen we arrived, we got there a little early, you know look around, we parked.  I turned to Michael, I told him take the safety off of his gun.  I did the same.  We put bullets in the chambers.  And I told him if Vito blinks wrong, we shoot him.  And once again, just for the record, this is back in 1989, and I was totally living my life in a different way back then.

A-1921.

Pennisi further conceded he had engaged in other fraudulent conduct. He had made false statements and committed fraud in connection with a car lease, reporting fictional employment at a restaurant owned by a friend's wife on the loan application.  *See* A-1931-1934.

18

### f.    *Pennisi's Flight After Committing a Homicide*

Pennisi revealed that the Gambino family was directly involved in assisting him escape from authorities after he had committed murder in 1989 (for which he was subsequently convicted, T. 1358).  *See* A-1938; A-1942-9143.  In order to avoid the authorities, Pennisi utilized his contacts and relationships with LCN and its members, and engaged in an elaborate and coordinated deceit to escape detection.  *See* A-1938-1939 ("We were saying we were going to college…."); A-1945-1946; A-1950. Pennisi fled from justice other times as well, including, at some point after 2007, hiding himself in a garbage container to avoid capture from the police after he had assaulted an individual. A-1907.

### g.    *Pennisi's Account of the Meldish Homicide*

While Pennisi was not involved in the Meldish homicide and disclaimed any "knowledge of who is involved, and who planned it, and all of that," *see* A-1763, he did add "a little bit of what I know, that maybe – maybe the average person who knows or read about the case, or that they don't – they don't know."  Pennisi recounted:

> there was a few things that happened with Michael Meldish that you know ultimately caused his demise. And one of them was, he was dating a girl that Mikey Nose, and if anybody don't know who that is, Mikey Nose is the boss of the Bonanno – of the Bonanno family, and he had interest obviously too in that girl, and he was away at the time. Now, and Michael Meldish was

19

not away, he was out, and he was dating this girl.  And a
message was sent to him about possibly you know – you
know, stay away from her, whatever way it was sent.

A-1761-1763.

Pennisi further explained, yet "Michael Meldish obviously disregarded that

message, because why?  Michael Meldish in his mind figures listen, years ago you

answered to me, you know you were part of our Purple Gang, and now I'm going

to start taking orders from you.  You know so that's what happened, he disregarded

that." *Id*.

In addition to the beating Meldish received outside Rao's restaurant, A-

1186-93, 2524-26, 2534-39, Pennis revealed that "another thing that took place

was there was some letter that I believe was written from Michael – Michael Nose

wrote a letter to this girl, and the letter somehow got back to Matty – Matty

Madonna.  And Matty Madonna was pushing for the Bonannos to take Mikey Nose

down as their boss.  So, this thing was – it was a lot of craziness that was going on,

all right. And of course, Michael Meldish was in the middle of all of this."  A-

1756.

Notably, Pennisi revealed that he had never heard the government's theory –

that Meldish was killed because of a debt he owed Madonna – until trial in this

case.  A-1763. Nor had Pennisi heard anyone within the Luchese Family use a

nickname for Steve Crea, including Stevie "Wonder", as Evangelista had claimed

20

Londonio had referenced when supposedly confessing to the murder. A-1955, *see* A-1256 (Evangelista testifying that Londonio stated, "Stevie Wonder and his son just got bail. He said these pricks had more to do with it than me."). [5]

## B.   *The District Court's Decision Denying the Motion*

The District Court denied Appellants' Rule 33 motion on the record following oral argument. A-2397. The Court concluded that it did "not believe the undisclosed crimes would have made a difference because, … the withheld bad acts are just more impeachment for an already thoroughly impeached witness, and they do not relate to the charged offenses." A-2368.

The Court found that "once you eliminate that which isn't new, that which isn't helpful to the defendants, and that which isn't material or is merely cumulative or impeaching, what you have left is not, considered together, likely to result in an acquittal." A-2372. *See also* A-2378-2379.

The District Court further speculated that nondisclosures regarding Evangelista's continued drug abuse, during the summer of 2017 when he interacted with Londonio and while he was cooperating against Appellants thereafter, would not have helped impeach his testimony about Londonio's confession because,

---

[5] Both the government and *GangLand News*, however, repeatedly used the alias "Stevie Wonder" when referring to Crea—both of which were sources available to Evangelista. A. 742, 1961, 2353.

there is no evidence that Evangelista was under the influence of drugs when he had the conversations with Mr. Londonio about which he testified; [and]

\*\*\*

He came across as too dim-witted to have fabricated such an accurate detailed story and kept it straight. Further, if he were fabricating, he could have come up with a much stronger, more elaborate fabrication, and the nature of his testimony just wasn't the sort of testimony that you would hallucinate or get wrong because you were high or you were misperceiving.

 A-2368-2369.

The District Court, relying on the government's unsworn representations, also found that MDC was not part of the prosecution team, A-2335-42; A-2397, and refused to conduct a hearing to examine the issue because it did not "have any reason to dispute the government's representations that they did not know of and did not possess the jail calls."  A-2335.

The Court added that "[a]s far as I'm concerned, any AUSA worth her salt doesn't need to be put under oath to know that she can't BS a federal judge. The government has made representations.  And I would have a hearing if there were facts undermining those representations." A-2335.

In short, the Court held the defendants did not meet their burden "to show a new trial was warranted."  A-2397.

22

## ARGUMENT

## POINT I

## A NEW TRIAL SHOULD BE GRANTED FOR ALL FOUR DEFENDANTS BECAUSE NEWLY DISCOVERED EVIDENCE AND/OR UNDISCLOSED *BRADY* AND/OR 3500 MATERIAL WOULD HAVE RESULTED IN EITHER <u>AN ACQUITTAL OR A DIFFERENT RESULT AT TRIAL</u>

Defendants' Rule 33 motion for a new trial included several bases, including newly discovered evidence as well as the government's failure to disclose in timely fashion both exculpatory material and information – *Brady* material – and witnesses' prior statements – 3500 material. The standards for evaluating each are discussed *seriatim*.

### A. *Legal Standards Pertinent to a Rule 33 Motion Based on Newly Discovered Evidence*

Pursuant to Rule 33, Fed.R.Crim.P., a new trial should be ordered based on newly discovered evidence when a defendant establishes "(1) the evidence [was] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *United States v. Forbes*, 790 F.3d 403, 406-07 (2d Cir.2015), *quoting United States v. Owen*, 500 F.3d 83, 87-88 (2d Cir.2007).

Newly discovered evidence is material when it corroborates significant and previously uncorroborated aspects of the defense case. *See United States v. Siddiqui*, 959 F.2d 1167, 1173 (2d Cir.1992). The test is *not* whether the government's evidence was sufficient to sustain conviction. *Cf.* Fed.R.Crim.P. 29. Instead, a Rule 33 motion succeeds when the weight of the evidence at trial was not overwhelming in favor of conviction, the prosecution's case has been further weakened by the new evidence, and the new evidence casts doubt on the verdict, even if the verdict is still otherwise supported by legally sufficient evidence. *See, e.g., United States v. Autori*, 212 F.3d 105, 121 (2d Cir. 2000).

**B.** ***Legal Standards Applicable to Undisclosed* Brady *Material***

The standard for "materiality" for undisclosed *Brady* material is different – and less demanding for a defendant – than that applicable to newly discovered evidence generally. "[E]vidence is 'material' within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different," such that the failure to disclose "'undermine[s] confidence in the verdict.'" *United States v. Certified Environmental Services, Inc.*, 753 F.3d 72, 91 (2d Cir.2014), *quoting Cone v. Bell*, 556 U.S. 449, 469-70 (2009). The inquiry with respect to prejudice asks "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as

24

a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419 (1995). *See also Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome").

"[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal.... [M]ateriality is a 'reasonable probability' of a different result, and the adjective is important." *Kyles v. Whitley*, 514 U.S. 419 (1995) (internal citations omitted). *See also Certified Environmental Services*, 753 F.3d at 92.[6]

In that context,

> "[t]here are three components of a true *Brady* violation: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) that evidence must have been suppressed by the [Government], either willfully or inadvertently; and (3) prejudice must have ensued."

753 F.3d at 91, *quoting United States v. Jackson*, 345 F.3d 59, 71 (2d Cir.2003).

"Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government

---

[6] *But see United States v. Kahn*, 472 F.2d 272, 287 (2d Cir.1973) (to the extent any newly discovered evidence was "known to the government at the time of trial, but not disclosed," the standard for "materiality of the evidence to the defendant is measured by the effect of its suppression upon preparation for trial, rather than its predicted effect on the jury's verdict").

witness." *Certified Environmental Services*,753 F.3d at 91.  *See also Strickler v. Greene*, 527 U.S. 263 (1999); *United States v. Bagley*, 473 U.S. 667, 676-77 (1985); *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir.2012).

Impeachment material is not treated any differently for *Brady* purposes. *See Bagley*, 473 U.S. at 676 ("reject[ing] any… distinction between impeachment evidence and exculpatory evidence."). Indeed, "[e]vidence of impeachment is material if the witness whose testimony is attacked supplied the only evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." *United States v. Wong*, 78 F.3d 73, 79 (2d Cir.1996) (citations omitted)).

Courts need not resolve underlying questions of willfulness or inadvertence regarding *Brady* violations.  Rather, "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution*."  *Brady*, 373 U.S. at 87(emphasis added).

**C.**     ***The Legal Standards Applicable to Non-Production of 3500 Material***

Deliberate versus inadvertent failures to produce 3500 material are analyzed under separate standards. "[A] new trial is warranted if the evidence is merely material or favorable to the defense' when the government either "deliberately

26

suppresses evidence" or "ignores evidence of such high value that it could not have escaped its attention." *United States v. Hilton*, 521 F.2d 164, 166 (2d Cir.1975)). Conversely, "if the government's failure to disclose is inadvertent, a new trial is required only if there is a significant chance that this added item, developed by skilled counsel, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *Id. See also United States v. bin Laden*, 397 F. Supp.2d 465, 485 (S.D.N.Y. 2005) (footnote omitted).

The "merely material or favorable" standard set forth in *Hilton* for "deliberate" non-production of Jencks Act material has also been used by this Court in *United States v. Kahn*, 472 F.2d 272, 287 (2d Cir.1971) and *United States v. Morell*, 524 F.2d 550, 555 (2d Cir.1975). "[T]his type of 'materiality' appears to have [a] very low threshold. '[T]he materiality of the evidence is measured by the effect of its suppression upon preparation for trial, rather than its predicted effect on the jury's verdict.'" *United States v. Turner*, 490 F. Supp. 583, 608 n3 (E.D.Mi. 1979)), *quoting Kahn*, 472 F.2d at 287. *See also Morell*, 524 F.2d at 554. Gross negligence is also the functional equivalent of "deliberate" conduct. *See Morell*, 524 F.2d at 554-55 ("if the failure of the government to produce the confidential files was deliberate *or the result of gross negligence*, the appellants would be entitled to a new trial") (emphasis added).

27

### D.    *The Standard for False Testimony By a Government Witness*

When the newly discovered evidence demonstrates that the testimony of a key government witness was false, a new trial must be granted – especially when the witness's testimony was central to the government's theory of prosecution, *see, e.g., United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991, and the evidence provides the defense with a new avenue to impeach the witnesses' testimony.  *See, e.g., Banks v. Dretke*, 540 U.S. 668 702 (2004);  *Mahaffy*, 693 F.3d at 132.

When false testimony by a government witness is uncovered after trial, this Court has "appl[ied] directly the test given … by the Supreme Court, which has told us that convictions in cases of this sort must be reversed unless the evidence was so overwhelming that there is no 'reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  *Su v. Filion*, 335 F.3d 119, 129 (2d Cir.2003), *citing Agurs v. United States*, 427 U.S. 97, 103 (1976). *See also United States v. Dubose*, 619 F.2d 973, 979 (2d Cir.1980).

In the context of perjured testimony, "a witness's credibility could very well [be] a factor of central importance to the jury, indeed every bit as important as the factual elements of the crime itself." *United States v. Stofsky,* 527 F.2d 237, 246 (2d Cir.1975), *citing United States v. Seijo*, 514 F.2d 1357 (2d Cir. 1975).

28

###### E. *The Cumulative Effect of Non-Disclosure Can Be Material*

As the District Court recognized here, A-2372, the cumulative effect of the untimely disclosures and non-production of both *Brady* and 3500 material can amplify their impact and the prejudice suffered by Appellants. *See Cone*, 556 U.S. at 471, 475.

###### F. *The Newly Discovered and/or Untimely Disclosed Information Was Material Because It Undermined Central Elements of the Government's Theory, Provided Important New Impeachment of Key Government Witnesses, and Established That Those Witnesses Committed Perjury at Trial*

Contrary to the District Court's analysis, the new evidence was material pursuant to whichever standard applies to newly discovered evidence (that it would have resulted in an acquittal); to undisclosed *Brady* material (that the result of the proceeding would have been different); to deliberately withheld 3500 material (that it was "merely material or favorable"); to inadvertently unproduced 3500 material (sufficient to raise a reasonable doubt to avoid conviction); and/or to government witness perjury (evidence was so overwhelming that there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury").

1.      ***The Newly Discovered and/or Untimely Disclosed Information Undermines Essential Elements of the Government's Theory of Liability***

The materiality of the new information is manifest, as it discredits essential aspects of the government's case with respect to the Meldish homicide:

> (1)   that the murder required the knowledge and approval of leadership; and

> (2)   that the murder was committed on behalf of the Luchese Family.

The new information also raises important questions about the government's reliance on – and the admissibility of –multi-level hearsay that was deemed sufficiently reliable to be admitted at trial.

a.      ***The New Information Repudiates the Government's Theory That Any Murder Required Permission from Leadership***

Through the testimony of Pennisi, SA Carillo, the multi-level hearsay declarations of Joseph Datello, and Evangelista's testimony regarding Londonio's purported confession, the government put forth the theory of its case: that approval by Luchese Family leadership – e.g., Madonna and Crea – was a prerequisite for the Meldish homicide.

Yet the new information establishes that not only was approval *not* required with respect to violence – even murder – committed against non-members of LCN

30

(such as Meldish), but that *not* seeking approval was proper in instances when the alleged victim was not a member of LCN (i.e., Meldish) and was more the norm than the exception. For example, as set forth **ante**, at 11-13, Pennisi's account of his planned assault on John Gotti, Jr., and Pennisi's candid admission that any "friend," *i.e.*, formal LCN member, even a "soldier" like Pennisi could authorize – even *self*-authorize, as was the case with respect to Gotti and others – the most serious forms of violence, completely unravels the government's theory.

Indeed, in addition to his self-authorized attempts against Gotti and the non-authorized attempt on his own life by Perna, *see* **ante**, at 11, 17, Pennisi recounts how he had advised another alleged member in the Luchese Family that he would kill that member's nephew if Pennisi saw him again lurking on his street. According to Pennisi, under LCN protocol because the nephew was *not* an LCN member permission was *not* required for such a murder. A-2150 ("I said, Joe, if I catch your nephew not only on my block, but in my area, I'm going to leave your nephew in the street. Now, his answer as a brother in that life to me is, because don't forget the nephew is now a civilian, right.… He's not in that life. His answer to me is supposed to be, well if I find out that my nephew is – don't worry about it, I'm going to leave him in the street."); A-2191-2192.

In its opening statement, the government previewed its false hypothesis in describing the Luchese Family hierarchy:

31

> [s]itting atop all of this is what they call the
> "administration," the consigliere, the underboss, and the
> boss, the leadership of the family. . . .  Although there are
> captains, soldiers between the leadership and what
> happens on the street, make no mistake, the leaders
> oversee the criminal activity of everyone below them.

A-930.

The government presented SA Carillo as an expert to advance a version of

LCN decision-making completely contradicted by the new information from

Pennisi. T. 576-77 (informing the jury it would "hear from an expert in organized

crime and from a member of the Lucchese family who will tell you how the family

is structured, who was in charge and how murders are carried out.").

SA Carillo testified that a murder – any murder – could be performed only

after approval by all members of the administration:

Q:     When it comes to killing someone, be it an associate or made member,
       can any Cosa Nostra make that decision?

A:     No.  Any murder, which – I mean, are you talking about a sanctioned
       murder?

Q:     Who is allowed to make the decision?

A.     An approved murder can only be made, the final decision is by the
       boss or the acting boss of the family.  Within – and dealing with the
       administration of that family.  So the calls for murders and violent
       crimes always get kicked up to the administration of the family with
       the final say being made by the boss.

Q.     And does the administration itself typically carry out the murder?

32

A.    They can.  There's been times where people in the administration have, but sometimes they will give that murder to a crew, to a captain, and then it's up to that captain to decide who to assign the murder to. Sometimes it's given, in particular they will request that a particular member of that captain's crew does the murder.

Q.    If a boss orders the murder of someone under his own family's protection, is that within the rules?

A.    Yes.

Q.    What if the boss wants to have someone murdered who is under another family's protection?

A.    Well, they would have to – if there is an associate on record, even though he is outside the family, and a different family wanted that person killed, he has to go to the administration of the family that associate is on record with;  and then they will make the choice if the murder can be done, and sometimes it will be their choice whether to commit the murder or not.  Themselves, not the family having the dispute, the family that he belongs to.

A-1057-58.

The government relied exclusively on SA Carillo's testimony for the proposition that there are only two types of murders within the scope of an LCN enterprise's affairs:  a murder is either sanctioned by the entire administration, or committed "on the sneak" by one of its members:

Q.    Now, we have been talking about what you call sanctioned murders approved by the administration?

A.    Yes.

Q.    Are all murders sanctioned?

33

A.      No.

Q.      What do you call a murder in organized crime that's not sanctioned?

A.      A "sneak murder."

Q.      Why is it called a sneak murder?

A.      Because you are not getting the permission of the administration of the family to commit the murder.

                    *                    *                    *

Q.      Is there any third category of murders other than sanctioned and sneak? Have you ever seen? Can you think of a third type?

A.      No. Not within Cosa Nostra.

Q.      Are you familiar with any murder that was sanctioned by the boss that did not involve the administration?

A.      Not to my knowledge, no.

A-1059-60.

In summation, the government cited SA Carillo's testimony in repeating its

theory:

> If this chain of command has to meet just to iron out a little money issue with Londonio, you know they're the ones, the only ones who are going to send him out to commit this murder, and that's exactly how Special Agent Carillo told you the Mob works.
>
> A murder in the Mob is going to be approved by the boss in consultation with the administration. *That's also how Pennisi understood things from a lifetime around the Mob and five years as a made member of the family.*

34

> *Only the administration could order a soldier to kill someone.*

T. 4416 (emphasis added). *See also* A-1435.

Yet if Pennisi's podcast sessions made one fact clear, it was that it was certainly *not* the practice that only "the administration" could order a soldier to commit murder; indeed, Pennisi stated the exact opposite, and cited instances to prove it. *See* **ante**, at 11-13.

Accordingly, the government's theory of prosecution, predicated so heavily on SA Carillo's "expert" testimony, would have been entirely neutralized by the new information. Likewise, the prosecution's misleading claims to the jury that a member in the Luchese Family (*i.e.*, Pennisi) supported such a theory would have been easily exposed.

### b. *That the Murder Was Committed on Behalf of the Luchese Family*

The new information provides significant evidence that the Meldish homicide was not committed by or on behalf of the Luchese Family, and includes significant evidence of not only an alternative perpetrator, but also of a motive far different than the one proffered by the government at trial.

> **i.** ***Pennisi's Account of the Reasons for the Meldish Homicide Varies Dramatically from the Government's***

As set forth **ante**, at 19-20, Pennisi's explanation of the murder, which "the average person" would not know, placed responsibility on the Bonanno Family due to Meldish's relationship with a woman who was also in a relationship with Michael Mancuso ("Mikey Nose"), at the time the "boss" of the Bonanno Family.

Pennisi did not mention the government's trial theory: that Meldish was killed as a result of a debt he allegedly owed Madonna. As a Luchese insider, Pennisi's explanation for the Meldish murder is no less viable or reliable than that presented by the government exclusively through the hearsay declarations of Joseph Datello. T. 557, 1240-1248, 1834-1846, 4412; GX702A & A-1529.

Indeed, the alternative accounts would be admissible under Rule 806, Fed.R.Evid., through which a hearsay declarant could be impeached as if he were a witness. The new information also casts doubt on the basis for finding Datello's hearsay sufficiently reliable to admit at trial, an issue litigated in the motions *in limine*. *See* Madonna Brief, at POINT I.

The new information establishes that Pennisi did not even learn of the government's theory *until he read about it during trial*, thereby providing persuasive evidence that Datello's story was his alone, and not even circulated

among Luchese Family members at the time of the murder or afterward.  *See* **ante**, at 13-14.

### ii. *Pennisi's Podcast Statements Demonstrate That an LCN Member Would Not Be "In the Know" Regarding Murders*

Pennisi's podcast statements, replete with a certain level of bravado, nevertheless acknowledge, contrary to the government's thesis that Datello would have reliable knowledge about the Meldish homicide, that even formal membership in an LCN organization would not entitle a member to be "in the know" with respect to serious offenses like murder.  *See, e.g.*, **ante**, at 13-14.  In fact, according to Pennisi, murders were *not* discussed.  *Id.*

Pennisi himself lacked personal knowledge about the Meldish homicide (*see* **ante**, at 19), reinforcing that murders were confidential matters, and directly conflicting with the government's theory that Datello's remarks reflected shared institutional knowledge.

The government presented Pennisi as an emblematic Luchese "soldier" fully versed in LCN's protocols and activities. If the jury had been apprised of Pennisi's accounts, there is little if any chance the jury would have credited the unsourced gossip by a discredited figure like Datello.

**G.** ***The New Information Would Have Impeached the Credibility of Critical Government Witnesses Regarding Substantive Aspects of the Case and the Witnesses' Bias Against Appellants***

The new evidence contradicts the substantive testimony of the government's key trial witnesses, undermines their credibility generally, and would have provided important new lines of impeachment against each. It would have directly affected the defense's cross-examination of witnesses such as Pennisi and Evangelista, and, as noted **ante**, also impeached the testimony of other important government witnesses (such as SA Carillo) and hearsay sources (such as Datello).

As detailed **ante**, at 10-21, Pennisi's podcast statements provide material, previously unavailable impeachment regarding his failure to disclose all of his prior criminal conduct, his history of fraud, his bias against Defendants (deliberately aggravated by the government), his wanton conduct and disrespect for the justice system (including being prepared to commit another murder) while on bail for a homicide, and florid mental health issues and episodes that could themselves have neutralized his testimony in its entirety.

Likewise, as set forth **ante**, at 3-10, Evangelista's recorded MDC calls and sentencing submissions contain valuable avenues of cross-examination that did not otherwise exist at trial: his capacity for wholesale invention (evident from his conversations with Burman, and his plan to withdraw his plea), his continued criminal conduct while cooperating, his motive to testify falsely (his bias against

38

Appellants), his retaliatory and vengeful intentions (evidenced in his conversations with his family), his mental health issues, and his contemporaneous ploy "to do something" to escape the consequences of his guilty plea on the eve of his cooperation against Londonio.[7]

In addition, for both Pennisi and Evangelista, and by implication for *all* of the government's cooperating witnesses, the new information completely dismantled an essential component of *every* cooperating witness's testimony: that the witness has ceased criminal activity, that the witness has disclosed to the government all past criminal conduct, and that the witness appreciates that his interest is in testifying truthfully to receive the benefits of cooperation.

That alone would provide material impeachment to challenge the credibility of a cooperating witness effectively, which the District Court, in focusing solely on comparing the seriousness of disclosed versus undisclosed conduct, failed to appreciate at all. *See* A-2361-65; A-2383-84.

Similarly, the District Court missed the point of Evangelista's attempts to withdraw his plea, including his plot to blame his own lawyer and alerting his sister that he would try do something on the eve that he reported Londonio's

---

[7] While Londonio was acquitted of the escape charged in Count Ten, Evangelista's testimony affected all Appellants adversely because it included the fictionalized confession he claimed Londonio offered, *see* T. 4383-4386, 4418-4423, 4650 (government summation emphasizing Evangelista's account), and the jury requested a review of that specific testimony during its deliberations. T. 4812.

escape and confession to murder to withdraw his plea. While the Court noted "[i]t was clear to the jury that Evangelista was trying to get out from under the long sentence he faced on his guilty plea and even had tried to cooperate before he ever met Londonio," A-2381, that was not its import. Rather, it demonstrated Evangelista's motives and capacity for complete fabrication against an innocent party to achieve his objectives, which was all contemporaneous to his cooperation here.

Defense counsel at trial could not have explored these subject matters without the factual basis the new information provided. In *Su*, this Court recognized the bind in which incomplete or inaccurate disclosure places defense counsel, and declined to "fault the defendant for not proceeding in his cross-examination on the assumption that the prosecutor is a liar," adding:

> it seems hardly reasonable to require a defendant to risk opening the door to adverse testimony concerning a sentencing agreement from a government witness on the chance that the prosecutor had both intentionally mischaracterized that witness's dealings with the government before trial and knowingly elicited false testimony denying that an agreement had been made. But even apart from that, the Supreme Court, in an analogous situation, has made clear that conscientious counsel *can* rely on prosecutors to live up to their obligations. *See Strickler v. Greene,* 527 U.S. 263, 286-87, (1999).

335 F.3d at 128.

Pennisi's and Evangelista's importance to the government's case is self-evident, amplifying the materiality of the new information. *See, e.g., Su*, 335 F.3d at 129; *United States v. Burnside*, 824 F. Supp. 1215 (N.D. Ill. 1993) (absent chief witness's testimony, government's case would be afflicted by a "gaping hole of reasonable doubt"). *See also Banks*, 540 U.S. at 698-99 (withheld evidence impeached a "key witness" whose testimony was "crucial to the prosecution"); ; *Giglio v. United States*, 405 U.S. 150 (1972), (withheld evidence impeached a witness on whose testimony "the government's case rested almost entirely"); *Cf. Turner v. United States*, 137 U.S. 1885, 1894-95 (2017) (no *Brady* violation when evidence withheld impeached "a minor witness").

Evangelista was critical to the government's case on Count Three. The government informed the Court sentencing Evangelista that his "testimony regarding admissions he received from Londonio (a) that Meldish had disrespected Madonna who ordered him killed, and (b) that Crea Sr. and his son conveyed the order to kill Meldish to him, *was critical to convicting Madonna and Crea Sr. on the murder count*." *United States v. Evangelista*, 17 Cr. 191 (RA), ECF # 41, at 5-6 (emphasis added). The District Court's claim to the contrary, *see* A-2385, was erroneous.

41

1. ***The New Information Provided Material Additional Avenues of Impeachment***

   a. ***The New Avenues of Impeachment of Evangelista***

The previously unavailable avenues of impeachment of Evangelista generated by the new information include recordings and other statements:

(a) demonstrating his bias and motives to fabricate against Appellants (*i.e.*, events involving abuse and assault he claimed to endure as result of his cooperation against Londonio). *See* **ante**, at 5-6; *see also* **ante**, at 4-5;

(b) describing his continued criminal activity and drug abuse, in violation of his cooperation agreement, which constituted crimes that mirrored the same crimes he claimed Londonio was committing while they were imprisoned together (*i.e.*, accusing Londonio of selling drugs and using his family members to receive payment from Western Union (A-1257-58)), notwithstanding his claim of rehabilitation. *See* **ante**, at 8-10;

(c) revealing his capacity for wholesale invention of comprehensive false narratives (such as his plot to withdraw his guilty plea, and conversations to extort the Burman's). *See* **ante**, at 7, 9-10;

(d)     establishing his corrupt motives (including that the government was

threatening to charge him with perjury, and that he wanted to take

back his plea to avoid further imprisonment) to cooperate and curry

favor with the government.  *See* **ante**, at 6-7;

(e)     regarding his unsuccessful attempts to cooperate, and that he would

not implicate certain people in criminal activity if they did as he

wished (*i.e.*, family members), further demonstrating his need to

fabricate a serious crime – *i.e*., Londonio's confession to a murder –

committed by others at the time of his accepted cooperation.  *See*

**ante**, at 3-10;  and

(f)     directly contradicting his trial testimony alleging Londonio's

confession, including new evidence showing that "tabloid press"

accounts of the Meldish murder were available to him while in prison.

*See* **ante**, at 4.

The untimely disclosures relating to Evangelista were uniquely prejudicial

and material given that the testimony of a jailhouse informant (claiming a

confession by another) is generally highly suspect, and in light of the Court's in-

trial decision reversing its pretrial decision (to the contrary) to allow Evangelista to

43

testify that Londonio had confessed to him and implicated Crea and Madonna in that confession.  *See* A-1157-66.[8]

Evangelista's unconscionable deception and extortion of Mrs. Burman in their telephone conversations would have also served multiple impeachment objectives.  In addition to refuting conclusively his claim that he had ceased all criminal activity by such time, while also during the time in which he was attempting to attain a cooperation agreement, those recordings would have portrayed Evangelista in an accurate light:  a vicious, remorseless criminal capable of creating an elaborate fiction to accomplish his corrupt objectives, and brazenly extorting $400 while on a monitored prison telephone system just days before he proffered that Londonio confessed to a murder.  *See* **ante**, at 7-9.

The new information established indisputably that contrary to his claims at trial, Evangelista never experienced any moral transformation in May 2017, but

---

[8] Testimony from jailhouse informants, particularly regarding purported confessions, requires a higher level of scrutiny than accorded normal witnesses. *See Kansas v. Ventris*, 556 U.S. 586, 597 (2009) ("[t]he likelihood that evidence gathered by self-interested jailhouse informants may be false cannot be ignored"); *Zappulla v. New York*, 391 F.3d 462, 470 n.3 (2d Cir.2004) ("numerous scholars and criminal justice experts have found the testimony by 'jail house snitches' to be highly unreliable . . .  "the use of jailhouse informants to obtain convictions may be 'one of the most abused aspects of the criminal justice system'") (other citations omitted);  Luke G. Allen*, Lies Behind Bars: An Analysis of the Problematic Reliance on Jailhouse Informant Testimony in the Criminal Justice System and a Texas-Sized Attempt to Address the Issue*, 98 Wash. U. L. Rev. 257, 257 (2020) ("criminal informants are the leading cause of wrongful convictions in capital cases, accounting for 45.9% of death row exonerations").

instead remained an artful scam artist throughout his cooperation trying to do anything to escape the consequence of his own criminal behavior, culminating in his cooperation and testimony herein that garnered him a sentence of time-served and the ingenuous, if entirely undeserved, praise from his sentencing judge. Indeed, he continued his drug use while interacting with Londonio in the summer of 2017 (during the exact time in which he claimed to have received his confession to murder) and until the eve of his trial testimony. *See* **ante**, at 8.

### b. *The New Avenues of Impeachment of Pennisi*

The new avenues of impeachment available at trial with respect to Pennisi include the following:

(a)  prior criminal acts he did not, contrary to his testimony, disclose to the government in the course of his cooperation, and for which he was not prosecuted (and which constituted a violation of his cooperation agreement). *See* **ante**, at 17-18;

(b)  his utter disregard for the justice system and ability to deceive, as manifested by his conduct while on bail for a homicide – including carrying a firearm in preparation for committing another homicide – as well as other violent conduct he had not disclosed. *See* **ante**, at 18-19;

45

(c)     his commission of frauds that cast grave doubt on his credibility. *See*

   **ante**, at 18;

(d)     the government's affirmative role during proffers in solidifying his

   perception that the Luchese Family was stalking him and plotting to

   kill him, which provided a motive to fabricate against Appellants. *See*

   **ante**, at 15, and **post**, at 45-47; and,

(e)     his description of the paranormal activity driving his decision to

   cooperate, which confirms that his mental health was a proper ground

   for cross examination, especially since these events occurred during

   the relevant time frame. *See* **ante**, at 16-17;

The comparisons between the new information and Pennisi's trial testimony
are stark. For example, Pennisi's testimony that he had disclosed all of his past
criminal conduct was quite simply false in light of his subsequent podcast
revelations:

Q.     You admitted to the Government all of your crimes, right –

A.     Yes.

Q.     – in your proffer sessions, many of them very early on, correct?

A.     Yes.

T. 1519-1520. *See also* T. 1483-89.

46

Regarding attempts on his life and his decision to cooperate, his testimony on that subject was not remotely as fulsome.  T. 1467-1476.  He did not provide *any* testimony about fending off multiple attackers, or chasing purported Bloods gang members down crowded Manhattan streets.  See **ante**, at 14.

The government manipulated Pennisi and the trial process, presenting Pennisi's understanding that the Luchese Family had been following and surveilling him:

Q.     You were in the Mob at the time.  Couldn't they have been FBI

agents?

A.     A lot of people have said that, but I – it wasn't any law enforcement because I don't – I don't know law enforcement's faces for them to hide their face.  They would have just – the guy would have just did what the driver did.  They could have just turned their head around, both of them, and I wouldn't have seen their faces.  I knew it was somebody that I knew who was sitting in that car.  And as I explained, they were laying to get my – a pattern on me now. See, my –

Q.     Why did you think these people were trying – why did you think these people were trying to get a pattern on you, as you say?

A.     Because of the events that I just explained to you, especially after the wake.  I just something's terribly wrong when you are going to a wake with your Family, and, you know, I love and respected these people.  I was 100 percent to my call loyal and I, you know, there – I just couldn't understand what – what changed – what –  what – so, I knew something was seriously wrong and I knew that I was definitely in jeopardy.

T. 1471-72.

Yet the defense, and ultimately the jury, certainly had a right to know that Pennisi was simply *parroting to the jury what the government had told him during proffer sessions.* Indeed, the "people" responsible for convincing Pennisi that it was not law enforcement "laying on him," but instead the Luchese Family, were the very prosecutors conducting his direct examination.

The government also minimized Pennisi's crime of carrying a firearm (while being a felon-in-possession), presenting the impression that it was solely for self-defense:

> Q.  And what did you do that made you guilty of the weapons charge?
>
> A.  I possessed a weapon at various times.
>
> Q.  And to be clear, we talked about you having a gun when you were trying to protect yourself from the Family. Had you had a gun at any other time?
>
> A.  Yes.
>
> Q.  When was that?
>
> A.  After the strip club incident, Anthony Guzzo offered me a 25 gun. We were concerned about what just took place and we were worried about some kind of retaliation.

T. 1479-80.

That testimony misleadingly sanitized the extent of Pennisi's indiscriminate, threatening, and dangerous use of firearms against innocent civilians in public, which he recited at length during his podcast appearances—all of which further

48

solidifies that his paranoia rendered him incapable of perceiving events accurately. *See* **ante**, at 14-16. Indeed, the effect of Pennisi's mental health problems cannot be understated because they overlap directly with the time frame of the events to which he testified, as well as the time he decided to cooperate and engaged in lengthy proffer sessions. The jury could have easily rejected the entirety of Pennisi's testimony, finding him incredible given his fantastical "sign" to cooperate by virtue of his claimed supernatural experience with the deceased and his untreated mental health condition.

Pennisi's podcasts also confirmed that the Gambino Family assisted in his escape from prosecution for the 1989 murder, and that he engaged in long and calculated deceit to avoid apprehension and responsibility for that murder. And, even after being apprehended for that murder and granted bail, Pennisi still deceptively violated the conditions of his release, carried a firearm and was willing to kill another person.

The unavailability of the new information for use at trial was material because the government successfully sought in its motions *in limine* to preclude cross examination of Pennisi on many of the subjects that are now fully supported by the previously undisclosed evidence. A-715-741. For example, the Government's successful curtailment of the defense's impeachment of Pennisi

concerning his violence against women now must be viewed in the context of his history of explosive violence stemming from his untreated mental health issues.

As the defense's *in limine* submission stated:

> the defense has a good faith basis to question Pennisi about recent instances in which he suffered extreme paranoia and delusional behavior.  For example, the defense's investigation has unearthed that Pennisi's paranoia was so extreme that he would require his recent, former girlfriend to answer him on FaceTime (even if she was traveling on a highway or otherwise unable to use her phone at that moment) to ensure that another man was not present with her. The fact that Pennisi's paranoia and delusional behavior has continued decades after the jealously stricken murder he committed in 1989 (to include, current instances when he burned his former girlfriend's hair and knocked her teeth out with his fist), establishes a serious issue for the jury to consider when evaluating his ability to perceive surrounding events and his credibility generally.  That Pennisi had engaged in delusional, psychotic and felonious behavior – which, happened to occur in relation to his violent outbursts against women – does not undermine the legitimacy of the defense's right to impeach him on this subject.

A-773-74.

The new information vindicated the defense's position. The jury received a highly edited, sterilized version of Pennisi, which had a material impact on its consideration of his credibility.

50

## 2.    *The New Information Is Not Cumulative*

Nor can the new information be deemed "cumulative."  *See Smith v. New Mexico Department of Corrections*, 50 F.3d 801 (10th Cir. 1995); *United States v. Burnside*, 824 F. Supp. 1215 (N.D. Ill. 1993), (undisclosed material "would have provided the defense with more than merely insignificant supplemental support for cross-examination purposes") (citation and internal quotation marks omitted).

In *United States v. Wilson*, 481 F.3d 475 (7th Cir.2007), the Seventh Circuit rejected the government's argument that suppressed evidence impeaching its witness's testimony was cumulative:  "showing (as the defense did) that [the witness] had a long criminal record, lied all the time, and was testifying as part of a deal with prosecutors is not the same as showing that he was willing to use his position in the prosecution to get even with gang members who crossed him."  *Id*. at 481.

The Court in *Wilson* added that "[t]his was a new and potentially powerful line of inquiry that the defense could have used to undermine the value of [the witness's] testimony."  *Id*.;  *see also, e.g., Conley, v. United States*, 415 F.3d 183 (1st Cir. 2005), 415 F.3d at 192 (suppressed evidence impeaching key witness on basis of his ability to recall was "an entirely different form of impeachment" from the available impeachment evidence based on the witness's prior inconsistent statement and bias).

51

In *United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995), the prosecution argued that its key witnesses had been thoroughly impeached at trial by evidence of their extensive and varied criminal activities – so much so that evidence of additional crimes they committed would be cumulative.  The Seventh Circuit rejected that argument, first acknowledging that if the suppressed evidence merely "consisted of one more crime, or for that matter, ten more crimes committed by each of the witnesses . . . extending the list of past crimes would not have made a difference to the jury's evaluation of the witnesses' credibility."  55 F.3d at 246.

However, the evidence of additional crimes was not cumulative because the additional crimes, having been committed *after* the others, undermined the witnesses' testimony that they had "seen the light" after their earlier crimes and ceased their criminal activities.  *Id*.  The same is of course true here with respect to Evangelista and Pennisi.

**H.**      ***The New Information Establishes That Pennisi and Evangelista Committed Perjury During Their Trial Testimony***

The new information set forth **ante** further establishes that Pennisi and Evangelista committed perjury at trial – concealing criminal conduct from the government in contravention of their cooperation agreements and their testimony that they had made full disclosure, and, with respect to Evangelista, continuing to commit crimes even while cooperating.

52

The litany of Pennisi's non-disclosed criminal conduct is in stark contrast to his testimony at trial. *See* **ante**, at 46.

Evangelista's testimony was false in numerous instances. *See* T. 3049:10-19; T. 3059: 22-24; T. 3210:6-9; T. 3232: 17-19. *See also* T. 3001: 4-8 & 12-14; T. 3002: 16-18; T. 3113: 12-25 ; T. 3114:1-19; T. 3117:21-25 through T. 3118: 1; T. 3122:6-19; Government Exhibit 3502-33 (Evangelista's Cooperation Agreement, at page 2 subparagraphs (a), (f), and page 4, last paragraph).

## POINT II

### THE DISTRICT COURT ERRED IN CONCLUDING <u>MDC WAS NOT PART OF THE PROSECUTION TEAM</u>

The recordings of Evangelista's prison telephone calls were suppressed for purposes of *Brady* and 3500 material analysis because MDC, which cultivated Evangelista as a cooperator, was tasked with protecting him, and was responsible for the investigation of the attempted escape charged against Londonio – including collecting documents and other materials as evidence, and providing investigators, interviewers, and witnesses – was clearly part of the prosecution team.

The District Court concluded that MDC was not part of the prosecution team, primarily relying on the government's unsworn representations *See* POINT III, *infra*. Even assuming *arguendo* the accuracy of the government's claims, that conclusion was erroneous.

Case law establishes that MDC was part of the prosecution team.  In *United States v. Middendorf*, 2018 WL 3956494, at *4 (S.D.N.Y. 2018), the relevant criteria were identified as (1)  whether the other agency participated in the prosecution's witness interviews, (2)  whether the other agency was involved in presenting the case to the grand jury,  (3)  whether the other agency reviewed documents gathered by or shared documents with the prosecution, (4)  whether the other agency played a role in the development of prosecutorial strategy, or (5) whether the other  agency accompanied the prosecution to court proceedings.

Here the government acknowledged that "August 4, 2017, the FBI interviewed Evangelista at the MDC with Bureau of Prisons ("BOP") Special Investigation Agent Timothy Geier present, and also searched Evangelista's and Londonio's cells. (3502-18 at 1, 3545-02; T. 2874)."  Gov't Opp., ECF # 1226 at 10.  SIA Geier also was in email contact with the prosecutors and agents, and testified at trial.  T. 2865.

These facts are distinguishable from *United States v. Thomas*, 19 Cr. 830 (AT), ECF # 36, where BOP was held "not a member of the prosecution team where *BOP did not participate in the prosecution's witness interviews*; present the case to the grand jury; *review documents gathered by the prosecution*;  play a role in the development of prosecution strategy; or *play a role in the investigation that*

*led to charges against the defendants*." ECF # 1226, at 10 (emphasis added).

Here, BOP contributed to the case in *all* those *italicized* ways.

Similarly, *United States v. Rivera*, 2015 WL 1540517, at *3 (E.D.N.Y. Apr. 7, 2015), supports finding BOP was part of the prosecution team here. The evidence was indisputable that BOP was involved in the investigation or prosecution. *See* ECF # 1226, at 10. Likewise, in *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir.2006), this Court explained, in terms entirely applicable here to BOP's contributions, "[i]ndividuals who perform investigative duties or make strategic decisions about the prosecution of the case are considered members of the prosecution team, as are police officers and federal agents who submit to the direction of the prosecutor and participate in the investigation." *See also* ECF # 1226, at 4.

The District Court failed to apply those standards, instead concentrating on the few elements that were *not* present here rather than focusing, as it should have, on what relevant factors *were present*. A-2236-41.

Nor does it matter whether prosecutors knew of or knowingly possessed the *Brady* material that was not disclosed as long as the information was within the knowledge and/or possession of the wider investigative or prosecutorial team. *See Kyles v. Whitley*, 514 U.S. 419 (1995) ("individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the

case, including the police"); *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Morell*, 524 F.2d 550, 558 (2d Cir.1974) (Friendly, J., *dissenting*) ("requiring the right hand [of government] to know what the left hand is doing . . . should be particularly easy when . . . the material concerns the prosecution's chief witness"). The rule is not any different with respect to 3500 material. *See United States v. Owens*, 933 F. Supp. 76, 86 (D. Mass.1996).

In *Giglio* and *Kyles*, the Court made "short shrift" of the argument that a prosecutor's lack of knowledge, or even negligence, was sufficient to relieve the prosecutor of the duty to produce *Brady* material. *See Mastracchio v. Vose*, 274 F.3d 590, 600 (1st Cir.2001). *See also Chandris v. McGinnis*, 2002 WL 31946711 (E.D.N.Y.) (citing *Mastracchio* for the proposition that "[g]overnment agents at times may be aligned with the prosecution 'team' because they have continuing responsibility for the government witness") (emphasis added).

Here, Evangelista, was discovered by BOP, interviewed by BOP, delivered to the FBI and U.S. Attorney's office on a silver platter, held in BOP custody, and protected by BOP at MDC. *See United States v. Wilson*, 237 F.3d 827, 832 (7th Cir.2001) ("it is impossible to say in good conscience that the U.S. Marshal's Service was not 'part of the team' that was participating in the prosecution, even if the role of the Marshal's Service was to keep the defendants in custody rather than to go out on the streets and collect evidence"); *bin Laden*, 397 F. Supp.2d 465.

56

## POINT III

## THE GOVERNMENT CONSTRUCTIVELY POSSESSED
## THE EVANGELISTA RECORDINGS

Even if this Court holds that the MDC was not part of the prosecution team, the government nevertheless had an obligation to disclose the Evangelista recordings prior to trial because the government was in constructive possession of those recordings. During oral argument before the District Court, an Assistant United States Attorney proffered that the United States Attorneys' Office for the Southern District of New York has a "special agent who usually goes to [the] MDC … every so often" to pick up materials for the office. A-2247; *see also id*. ("It's not unusual for these things to come in sort of a drop-on-the-desk fashion.").

Although the government did not physically possess the recordings until after trial, the government gained constructive possession over the recordings once the MDC created the recordings Disc, wrote the relevant AUSA's name on it, and put it aside for pickup by the Southern District of New York special agent tasked with retrieving materials from the MDC. Accordingly, regardless of the MDC's status as a member of the prosecution team, the government had an independent obligation to disclose the Evangelista recordings to the defense.

**POINT IV**

**AN EVIDENTIARY HEARING IS REQUIRED TO
DETERMINE THE SCOPE OF THE UNTIMELY
DISCLOSED INFORMATION AND/OR THE
SCOPE OF THE GOVERNMENT'S MISCONDUCT**

When the parties dispute issues of fact regarding the newly discovered evidence, an evidentiary hearing is typically required. *See Siddiqi*, 959 F.2d at 1174. *See also bin Laden*, 397 F. Supp.2d 465 (hearing to determine whether United States Marshals Service was part of the prosecution team).

Here, the District Court abused its discretion in denying the request for a hearing based on the government's unsworn responses. A-2397(although Appellants urged that the Court "should not accept the government's representations, [] neither they nor I have any reason to doubt them. So I agree with the government that the defendant has not identified the factual dispute that would entitle them to relief if found in their favor."); A-2341, **ante**, at 22.

That constituted an abuse of discretion because the government's unsworn responses are insufficient to meet any standard for opposing Appellants' motion. *See, e.g., Peavy v. United States*, 31 F.3d 1341, 1346 (6th Cir. 1994) ("government must present evidence in support of its [op]position[,]" and "unverified responses" are "plainly inadequate"); *United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004) (government's responsive pleadings contain "unsworn argument[s] [that] do[

58

] not constitute evidence"); *see also Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009) (per curiam) ("[a]n attorney's unsworn statements in a brief are not evidence").

Indeed, in *bin Laden*, two prosecutors with impeccable reputations, Patrick J. Fitzgerald, and (now-Judge) Kenneth M. Karas, were required to testify rather than merely providing an informal recollection of events. 397 F. Supp.2d at 476-77 & ns.8-9.

The Court also erred in claiming, incorrectly, that "the representation that the government did not have these calls until after the trial is based on firsthand knowledge, and there's absolutely nothing to suggest otherwise." TA-2335. The colloquy at oral argument on the motion revealed that many of the government's crucial representations were hearsay, and even double hearsay:

> AUSA Rothman: The information in that letter comes *from a conversation that I had with the special agent from our office* who was given those calls after the trial by, as I understand it, like a paralegal at the MDC.
>
> There are proffers from me in that letter, your Honor, because I was the prosecutor who walked into my office in the fall of 2020 to find the disk of jail calls on my desk and then tried to figure out how they got there thereafter.
>
> THE COURT: And you have put two and two together that you think that this was prepared as a result of the subpoena that you had – you, Rothman, had sent earlier?

> MS. ROTHMAN:  Yes, your Honor. I want to be – there's a lot of facts in the record. I am fairly confident that *I also spoke with the paralegal at the MDC who prepared the jail calls, but it may have been that I received information about how he accidentally prepared them from the Special Agent.*

A-2243-44 (emphasis added).

That replicated the government's repeated speculation and surmise in its papers below, and powerfully reinforces the need for an evidentiary hearing to resolve many of the disputed issues of fact.  The government's conjecture also applied to the meaning of Evangelista's recorded calls, as it contended "*[i]t is not at all clear* that these recordings amount to actual threats, as compared to Evangelista expressing general frustrations toward his family." Gov't Opp., ECF # 1226 at 46 (emphasis added).

Most remarkably, several of the government's representations regarding the nondisclosures are unsupported by other facts in the record, which automatically necessitated the need for a hearing. For example, prosecutors presented evidence at trial that prison recordings are automatically erased after six months unless they are requested by the government for preservation, but it could provide no answer to the Court's inquiry as to why Evangelista's 2017 recordings were available at the time of its claimed subpoena in 2019. A. 2245. Likewise, prosecutors claimed that there was no evidence supporting the defense's position that Evangelista's prison calls showed his continued drug abuse during the summer of 2017, i.e., the time in

which he interacted with Londonio and purportedly received his confession to murder. A. 2265-2270; A-2350-2356. While prosecutors claimed there was no need for a hearing given the claimed the paucity of supporting evidence, Evangelista did an interview with *GangLand News*, during the pendency of the motion, in which he admitted that he continued to abuse drugs until the eve of trial. A. 2352-2356.

The government also skirted denials with responses such as "[t]he Government has no record or recollection of threatening Evangelista with a perjury charge." *Id*., at 47. *See also id*., at 7 (regarding Pennisi, "[t]he FBI agent assigned to Pennisi's case is aware of no statements the FBI made to Pennisi that fit that description (*see* A-2231, Karounos Aff., 2c), *although it remains impossible to rule out* that an agent who had only a fleeting interaction with Pennisi made a comment to that effect") (emphasis added); *id*., at 22 n. 7 ("[i]t would thus be unsurprising if Pennisi did mention this mundane detail when proffering, but no one in the Government recorded or remembers it").

The Court, too, conceded that important matters – such as the circumstances regarding Evangelista's concern that he would be charged with perjury – were unclear, but nevertheless declined to conduct the necessary hearing. *See* A-2379-2380 ("[t]here's a statement on a July 9, 2017, call that Evangelista was expecting a perjury charge. *One can't even tell what he's referring to*. . .") (emphasis added).

61

**Conclusion**

Accordingly, for all the reasons set forth above and all papers heretofore filed herein, the Court should grant Defendants' Rule 33 motion for a new trial, and/or, in the alternative, order the government to produce discovery and disclose *Brady* material, and/or order an evidentiary hearing.

Dated:      March 6, 2023
             New York, New York

                              Respectfully submitted,

                              /s/ Joshua L. Dratel
                              Joshua L. Dratel
                              Dratel & Lewis
                              29 Broadway, Suite 1412
                              New York, New York 10006
                              (212) 732-8805
                              jdratel@dratellewis.com

                              Andrew G. Patel
                              80 Broad Street, Suite 1900
                              New York, NY 10004
                              (212) 349-0230
                              apatel@apatellaw.com

                              *Counsel for Defendant*
                              *Matthew Madonna*

                              /s/ Anthony DiPietro
                              Anthony DiPietro
                              Law Office of Anthony DiPietro, P.C.
                              15 Chester Avenue
                              White Plains, New York 10601
                              914-938-3242
                              dipietrolaw@yahoo.com

Brendan White
524 East 20th Street, #6D
New York, New York 10009
646-303-0267
brendan@whiwhi.com

*Counsel for Defendant Steven L. Crea*


/s/ Brian A. Jacobs
Brian A. Jacobs
Daniel P. Gordon
MORVILLO ABRAMOWITZ
  GRAND IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
212-856-9600
bjacobs@maglaw.com

*Counsel for Defendant-Appellant
Terrance Caldwell*

/s/ Clara Kalhous
Clara Kalhous
116 Pinehurst Ave. #H13
New York, NY 10033
347-415-9523
clara.kalhous@gmail.com

*Counsel for Christopher Londonio*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing Brief of Appellant contains 13,657 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and that this Brief of Appellant complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6)because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Times Roman font.

/s/ Joshua L. Dratel

JOSHUA L. DRATEL